No. 23-3581

IN THE UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT

THE IMPERIAL SOVEREIGN COURT OF THE STATE OF MONTANA; ADRIA JAWORT; RACHEL CORCORAN; MONTANA BOOK COMPANY; IMAGINE BREWING COMPANY, LLC D/B/A IMAGINE NATION BREWING COMPANY; BUMBLEBEE AERIAL FITNESS; THE WESTERN MONTANA COMMUNITY CENTER; MONTANA PRIDE; THE GREAT FALLS LGBTQ+ COMMUNITY CENTER; THE ROXY THEATER; AND THE MYRNA LOY,

*Plaintiffs-Appellees*,

v.

AUSTIN KNUDSEN; ELSIE ARNTZEN; AND J.P. GALLAGHER,

*Defendants-Appellants*.

On Appeal from the United States District Court
for the District of Montana
Hon. Brian M. Morris, No. CV 23-50-BU-BMM

APPELLEES' ANSWERING BRIEF

Constance Van Kley
Rylee Sommers-Flanagan
UPPER SEVEN LAW
1 N. Last Chance Gulch
Helena, MT

Niki Zupanic
ZUPANIC LAW PLLC
P.O. Box 1982
Helena, MT 59624

*Attorneys for Plaintiffs-Appellees*

## DISCLOSURE STATEMENT

No Plaintiff-Appellee has a corporate parent. No publicly held corporation own 10% or more of the stock of any corporate Plaintiff-Appellee.

Date: February 9, 2024.

Upper Seven Law

*/s/ Constance Van Kley*
Constance Van Kley

*Attorney for Plaintiffs-Appellees*

i

## TABLE OF CONTENTS

**Page**

DISCLOSURE STATEMENT.............................................................................i

TABLE OF AUTHORITIES............................................................................ v

INTRODUCTION ........................................................................................ 1

STATUTORY AUTHORITIES.......................................................................2

ISSUES PRESENTED ..................................................................................2

STATEMENT OF THE CASE ......................................................................3

    A.    The Montana legislature intended to target drag through HB 359 bcause it did not want children to be exposed to gender-nonconformity ..............................................................3

    B.    HB 359 imposes criminal and/or occupational penalties for, *inter alia*, dressing up in gendered costumes while engaging in learning activities with children, displaying prosthetic breasts, and simulating the removal of clothing.................... 9

        1. Drag Story Hours ............................................................. 9

        2. Sexually Oriented Performances ....................................... 11

    C.    HB 359 has led to cancelled events, self-censorship, and confusion.......................................................................... 14

    D.    Plaintiffs filed suit and successfully moved for a temporary restraining order and preliminary injunction ...................... 17

SUMMARY OF THE ARGUMENT ........................................................ 18

STANDARD OF REVIEW ....................................................................... 21

ARGUMENT............................................................................................. 21

I.      Plaintiffs have standing to challenge HB 359, which threatens them with criminal and occupational penalties enforceable by Defendants Knudsen and Arntzen .............. 22

    A.      Plaintiffs suffer injury-in-fact because they must self-censor or risk criminal and occupational liability ...... 23

    B.      Plaintiffs' injuries are traceable to Defendants, who have enforcement authority under Montana law ....... 27

        1.      Attorney General may compel county attorneys to enforce HB 359, causing Plaintiffs' injuries ....... 27

        2.      Superintendent of Public Instruction Arntzen may initiate teacher disciplinary proceedings under HB 359; thus, she causes Plaintiffs' injuries ............................................................. 31

    C.      Injunctive relief redresses the injury Defendants cause by barring them from using their enforcement authority .................................................................... 33

II.     The district court did not abuse its discretion in preliminarily enjoining enforcement of HB 359 when HB 359 was intended to target drag and has the effect of broadly criminalizing speech ................................................. 35

    A.      Plaintiffs likely will succeed on the merits of their claims under the First Amendment ........................... 36

        1.      Tiered scrutiny applies to Plaintiffs' First Amendment challenge ........................................ 36

        2.      HB 359 falls within the scope of the First Amendment because it regulates non-obscene speech .............................................................. 40

        3.      HB 359 discriminates on the basis of content and viewpoint, triggering strict scrutiny ........... 46

iii

4.     HB 359 fails strict scrutiny ................................ 50

5.     Even under the State's proposed framework, HB 359 is unconstitutionally overbroad ............ 55

B.     Because HB 359's restrictions are unintelligible—except to authorize discriminatory enforcement—Plaintiffs are likely to succeed on the merits of their Fifth Amendment claim ................................................ 57

1.     HB 359's drag story hour ban fails to give "fair notice" of what it encompasses and leads to discriminatory enforcement ................................ 58

2.     HB 359's restrictions on "sexually oriented performances" fail to give "fair notice" of what they encompass and lead to discriminatory enforcement ......................................................... 61

C.     The remaining *Winter* factors favor Plaintiffs: in the absence of an injunction, they will suffer irreparable harm; and the balance of the equities and the public interest weigh in their favor ........................................ 65

III.     The preliminary injunction appropriately extends throughout the District of Montana ....................................... 66

CONCLUSION ................................................................................. 70

STATEMENT OF RELATED CASES ...................................................... 71

CERTIFICATE OF COMPLIANCE ........................................................ 72

FIRST ADDENDUM .......................................................................... 73

iv

# TABLE OF AUTHORITIES

## Cases

*ACLU of Nev. v. Heller,*
    378 F.3d 979 (9th Cir. 2004) ................................................... 23, 24

*Am.-Arab Anti-Discrimination Comm. v. Thornburgh,*
    970 F.2d 501 (1991) ................................................................. 25

*Animal Legal Def. Fund v. Wasden,*
    878 F.3d 1184 (9th Cir. 2018) ....................................................... 46

*Ariz. Right to Life Political Action Comm. v. Bayless,*
    320 F.3d 1002 (9th Cir. 2003) ....................................................... 24

*Armstrong v. Brown,*
    768 F.3d 975 (9th Cir. 2014) ......................................................... 67

*Ashcroft v. ACLU,*
    542 U.S. 656 (2004) ............................................................. 50, 68

*Associated Press v. Otter,*
    682 F.3d 821 (9th Cir. 2012) ......................................................... 65

*Barrientos v. 1801–1825 Morton LLC,*
    583 F.3d 1197 (9th Cir. 2009) ....................................................... 68

*Bd. of Airport Comm'rs of L.A. v. Jews for Jesus, Inc.,*
    482 U.S. 569 (1987) ................................................................. 38

*Berger v. City of Seattle,*
    569 F.3d 1029 (9th Cir. 2009) ....................................................... 40

*Boos v. Barry,*
    485 U.S. 312 (1988) ................................................................. 47

v

*Broadrick v. Oklahoma*,
413 U.S. 601 (1973) ...................................................................... 22, 39

*Brockett v. Spokane Arcades, Inc.*,
564 U.S. 786 (2011) ........................................................................ 38

*Brown v. Ent. Merchants Ass'n*,
472 U.S. 491 (1985) ............................................. 41, 45, 50, 54, 66

*Cal. Chamber of Commerce v. Council for Ed. & Res. on Toxics*,
29 F.4th 468 (9th Cir. 2022) ........................................................ 21

*Cal. Teachers Ass'n v. State Bd. of Educ.*,
271 F.3d 1141 (9th Cir. 2001) ...................................................... 58

*Citizens United v. Fed. Election Comm'n*,
558 U.S. 310 (2010) ........................................................................ 37

*City of Austin v. Reagan Nat'l Advert. of Austin, LLC*,
596 U.S. 61 (2022) .......................................................................... 49

*City of Chicago v. Morales*,
527 U.S. 41 (1999) .......................................................................... 61

*City of Ladue v. Gilleo*,
512 U.S. 43 (1994) .......................................................................... 54

*Chaplinsky v. New Hampshire*,
315 U.S. 568 (1942) ........................................................................ 41

*Coates v. City of Cincinnati*,
402 U.S. 611 (1971) ........................................................................ 62

*Cohen v. California*,
403 U.S. 15 (1971) .......................................................................... 44

vi

*Connally v. Gen. Constr. Co.*,
    269 U.S. 385 (1926) ...................................................................... 62

*Coyote Pub., Inc. v. Miller*,
    598 F.3d 592 (9th Cir. 2010) ...................................................... 37

*Desertrain v. City of L.A.*,
    754 F.3d 1147 (9th Cir. 2014) ............................................... 60, 61

*Does 1–5 v. Chandler*,
    83 F.3d 1150 (9th Cir. 1996) ...................................................... 21

*Dombrowski v. Pfister*,
    380 U.S. 479 (1965) ...................................................................... 38

*Elrod v. Burns*,
    427 U.S. 347 (1976) ...................................................................... 65

*Epperson v. Arkansas*,
    393 U.S. 97 (1968) ........................................................................ 26

*Erznoznik v. Jacksonville*,
    422 U.S. 205 (1975) ................................................................ 44, 48

*Ex Parte Young*,
    209 U.S. 123 (1908) ...................................................................... 28

*FCC v. Fox Television Stations, Inc.*,
    567 U.S. 239 (2012) ...................................................................... 60

*Fellowship of Christian Athletes v.*
    *San Jose Unified Sch. Dist. Bd. of Educ.*,
    82 F.4th 664 (9th Cir. 2023) ...................................................... 26

*First Nat'l Bank of Boston v. Bellotti*,
    435 U.S. 765 (1978) ................................................................ 47, 54

*Ginsberg v. New York,*
390 U.S. 629 (1968) ...................................................................... 44

*IMDb.com v. Becerra,*
962 F.3d 1111 (9th Cir. 2020) ...................................................... 37

*Junior Sports Magazines Inc. v. Bonta,*
80 F.4th 1109 (9th Cir. 2023) .......................................21, 35-36, 65

*Kois v. Wisconsin,*
408 U.S. 229 (1972) ...................................................................... 42

*Libertarian Party of L.A. Cty. v. Bowen,*
709 F.3d 867 (9th Cir. 2013) ........................................................ 22

*Lopez v. Candaele,*
630 F.3d 775 (9th Cir. 2010) ........................................................ 25

*Lujan v. Defenders of Wildlife*
504 U.S. 555 (1992), ......................................................... 22, 23, 28

*McGirt v. Oklahoma,*
140 S. Ct. 2452 (2020) .................................................................. 29

*Melendres v. Arpaio,*
695 F.3d 990 (9th Cir. 2012) ........................................................ 66

*Members of the City Council of L.A. v. Taxpayers for Vincent,*
466 U.S. 789 (1984) ...................................................................... 56

*Miller v. California,*
413 U.S. 15 (1973). .......................................................... 42, 44, 52

*Montana v. Rodney Robert Smith,*
No. CDC 2020-624 (Mont. 1st Dist. Ct., Lewis & Clark Cty.) ...... 29

*Montana ex rel. Fletcher v. Dist. Court of Nineteenth Judicial Dist.*,
859 P.2d 992 (Mont. 1993) ...................................................... 30, 31

*Nat. Res. Def. Council v. EPA*,
542 F.3d 1235 (9th Cir. 2008) ...................................................... 33

*Nken v. Holder*,
556 U.S. 418 (2009) ...................................................... 66

*Papachristou v. City of Jacksonville*,
405 U.S. 156 (1972) ...................................................... 61

*Perry Educ. Ass'n v. Perry Loc. Educators' Ass'n*,
460 U.S. 37 (1983) ...................................................... 50

*Planned Parenthood of Idaho, Inc. v. Wasden*,
376 F.3d 908 (9th Cir. 2004) ...................................................... 28

*Police Dep't of Chicago v. Mosley*,
408 U.S. 92 (1972) ...................................................... 18

*Project Veritas v. Schmidt*,
72 F.4th 1043 (9th Cir. 2023) ...................................................... 26, 37

*R.A.V. v. City of St. Paul*,
505 U.S. 377 (1992) ...................................................... 36, 41, 46, 50

*Reed v. Town of Gilbert*,
576 U.S. 155 (2015) ...................................................... 18, 46, 47, 48, 50

*Reno v. ACLU*,
521 U.S. 844 (1997) ...................................................... 51

*Rodgers v. Bryant*,
942 F.3d 451 (8th Cir. 2019) ...................................................... 68

*Rosenberger v. Rector & Visitors of Univ. of Va.*,
354 U.S. 476 (1957) ...................................................................... 46, 50

*Roth v. United States*,
354 U.S. 476 (1957) ............................................................................ 44

*S. Pac. Transp. Co. v. Brown*,
651 F.3d 613 (1980) ............................................................................ 28

*Sanders Cty. Republican Cent. Comm. v. Bullock*,
698 F.3d 741 (9th Cir. 2012) ...................................... 37, 39, 68, 69

*Schacht v. United States*,
390 U.S. 58 (1970) .............................................................................. 40

*Sec'y of State of Md. v. Joseph H. Munson Co.*,
467 U.S. 947 (1984) ..................................................................... 22, 55

*Simon & Schuster, Inc. v. Members of N.Y. State Crime Victims Bd.*,
502 U.S. 105 (1991) ............................................................................ 46

*Spokeo, Inc. v. Robins*,
578 U.S. 330 (2016) ............................................................................ 23

*State ex rel. Woodahl v. Dist. Court of First Jud. Dist.*,
495 P.2d 182 (Mont. 1972) ................................................................ 28

*Steffel v. Thompson*,
415 U.S. 452 (1974) ............................................................................ 25

*Stromberg v. California*,
283 U.S. 359 (1931) ............................................................................ 40

*Thalheimer v. City of San Diego*,
645 F.3d 1109 (9th Cir. 2011) ......................................................... 37

*Tschida v. Motl,*
  924 F.3d 1297 (2019) ........................................................ 37

*Tucson v. City of Seattle,*
  __F.4th__, No. 23-35449, 2024 WL 390105 .................................. 58

*Twitter, Inc. v. Paxton,*
  56 F.4th 1170 (9th Cir. 2022) ............................................ 23

*United States v. Hansen,*
  599 U.S. 762 (9th Cir. 2023) ....................................... 38, 39, 55, 56

*United States v. Nat'l Treasury Emps. Union,*
  513 U.S. 454 (1995) ...................................................... 69

*United States v. Playboy Ent. Grp., Inc.,*
  529 U.S. 803 (2000) ............................................... 37, 40, 47, 48, 51

*United States v. Stevens,*
  559 U.S. 460 (2010) ...................................................... 41

*United States v. Williams,*
  553 U.S. 285 (2008) ............................................... 56, 58, 60

*Valle del Sol Inc. v. Whiting,*
  732 F.3d 1006 (9th Cir. 2013) ............................................ 24

*Virginia v. Am. Booksellers Ass'n,*
  484 U.S. 383 (1988) ...................................................... 25

*Ward v. Rock Against Racism,*
  491 U.S. 781 (1989) ...................................................... 48

## Statutes & Constitutional Provisions

HB 359 ..................................................................................*passim*

HB 359, 2nd Reading Amend.,
    (Apr. 4, 2023) .................................................................. 3, 4, 5

Mont. Code Ann. § 2-15-501........................................................ 28, 31, 35

Mont. Code Ann. § 20-1-207......................................................... 9

Mont. Code Ann. § 20-3-106......................................................... 31

Mont. Code Ann. § 20-4-110......................................................... 32

Mont. Code Ann. § 45-8-205......................................................... 44, 62

Mont. Const., art VI ................................................................ 28, 35

U.S. Const., amend. I ...............................................................*passim*

U.S. Const., amend. V ............................. 20, 21, 25, 35, 42, 51, 57, 60, 65

## Rules

Fed. R. Civ. P. 5.1 .................................................................. 35

Fed. R. Civ. P. 19 ................................................................... 32

Fed. R. Civ. P. 20 ................................................................... 32

## Other Authorities

Rachel E. Barkow,
   *Federalism & Criminal Law:*
   *What the Feds Can Learn from the States*
   109 Mich. L. Rev. 519 (2011)......................................................... 30

*Drag*, Merriam-Webster.com,
   https://www.merriam-webster.com/dictionary/ drag..................... 59

Mont. Attorney Gen. Tim Fox,
   *2016 James R. Browning Symposium*
   78 Mont. L. Rev. 21 (2017)............................................................ 30

Mont. Leg., Free Conference Comm. Hrg.,
   (Apr. 26, 2023) ............................................................ 5, 6, 8, 43, 49

Mont. Leg., H. Judiciary Comm. Hrg.,
   (Feb. 9, 2023) ........................................................................... 4, 5

Mont. Leg., H. Floor Sess.,
   (May 1, 2023) ................................................................................ 49

Mont. Leg., S. Floor Sess.,
   (Apr. 17, 2023) ..................................................................... 5, 7, 49

Mont. Leg., S. Judiciary Comm. Hrg.,
   (Apr. 4, 2023) ..................................................................... 3, 4, 5, 49

Comment, Quinn Yeargain,
   *Discretion Versus Supersession:*
   *Calibrating the Power Balance*
   *Between Local Prosecutors & State Officials*
   68 Emory L.J. 95 (2018) ................................................................ 30

## INTRODUCTION

It is clear what the Montana legislature meant to target through House Bill 359 ("HB 359"): drag. Legislators set their sights on drag because they believed—wrongly, and without evidence—that gender-nonconforming expression harms children. Obvious on the face of the law, their intent to stifle disfavored speech is proof enough that Plaintiffs likely will succeed on the merits of their First Amendment claim.

Far less clear—indeed, impossible to determine—is the law's effect. Through HB 359, the legislature wildly overshot its mark, threatening draconian penalties against individuals, businesses, and organizations engaged in speech far beyond drag performances. As confusing as it is discriminatory, HB 359 is void for vagueness.

HB 359 can withstand constitutional review only by <u>both</u> creating a new exception to the First Amendment for drag and ignoring the void for vagueness doctrine. It discriminates on the basis of content and viewpoint, broadly chills protected speech, and opens the door to discriminatory enforcement. The district court did not err in preliminarily enjoining Defendants from enforcing HB 359.

## STATUTORY AUTHORITIES

The relevant statutory authority, HB 359, appears in the Addendum to this brief.

## ISSUES PRESENTED

1. Whether Plaintiffs have standing to seek injunctive relief against the Montana Attorney General, who may force criminal proceedings under HB 359, and the Montana Superintendent of Public Instruction, who may initiate disciplinary proceedings under the same.

2. Whether the district court abused its discretion in preliminarily enjoining the State's enforcement of HB 359, a law that was intended to restrict drag performances and that criminalizes broad categories of speech and expressive conduct.[1]

3. Whether, after finding HB 359 to be likely facially unconstitutional, the district court abused its discretion by preliminarily enjoining the State from enforcing its provisions within the District of Montana.

---

[1] Plaintiffs' second issue statement corresponds to Defendants' second, third, and fourth issue statements, all of which relate to the preliminary injunction standard.

2

## STATEMENT OF THE CASE

A. **The Montana legislature intended to target drag through HB 359 because it did not want children to be exposed to gender-nonconformity.**

HB 359 was motivated by a single purpose: in the words of the bill sponsor, Representative Braxton Mitchell, the Montana legislature wanted to stamp out a "sick agenda" to expose children to "hypersexualized" content—*i.e.,* drag. Mont. Leg., S. Judiciary Comm. Hrg. at 8:54:46–8:55:06 (Apr. 4, 2023);[2] 1-ER-30. His concern was that, if exposed to gender-nonconforming expression,

> children may adopt and accept certain stereotypes or attitudes that could lead to social, psychological, linguistic difficulties. Children may also create an inadequate understanding of gender roles and experiences, which is damaging to their long-term social and emotional development.

*Id.* at 11:10:05–11:10:20; 1-ER-31.

Proponents echoed Representative Mitchell's fears, equating drag performers to pedophiles, predators, and child groomers. *See id.* at 8:56:22–8:56:34 ("[T]here are no little kids out there begging to be

---

[2] *Available at* http://sg001-harmony.sliq.net/00309/Harmony/en/PowerBrowser/PowerBrowserV2/20170221/-1/47987?agendaId=269135.

3

told a story by a drag queen. But suddenly, for some strange reason, drag queens are begging to tell stories to little kids."); Mont. Leg., H. Judiciary Comm. Hrg. at 08:57:33–08:58:05 (Feb. 9, 2023)[3] ("Subjecting children to drag shows or drag queen story hour[s] are indoctrinating and grooming children to believe that it is normal for men to play dress-up as their favorite female idol in dresses that reveal large silicone breasts while adorned in outrageous bouffant wigs and caked-on clownish makeup. Their appearance does not evoke one of a woman deserving of respect.").

Proponents disguised their moral panic with unsubstantiated pseudoscientific claims of harm to children. Representative Mitchell claimed that "[d]rag shows are damaging to a child's psychology and general welfare." *Id.* at 08:23:52–08:23:57; 1-ER-30. Proponents parroted this sentiment. *See* Mont. Leg., S. Judiciary Comm. Hrg. at 9:01:45–9:02:30 (Apr. 4, 2023) ("[Attending drag shows] can increase mental health problems in kids such as depression, eating disorders, anxiety, and self-harm. This can also make kids highly likely to engage

---

[3] *Available at* https://sg001-harmony.sliq.net/00309/Harmony/en/PowerBrowser/PowerBrowserV2/20170221/-1/47759?agendaId=251847.

in sexual acts at an earlier age or develop intimacy issues or sex addictions."); *id.* at 9:03:28–9:03:50 ("[P]arents who support bringing their minors to these events are just as liable as the performers and should be held accountable. . . . Adults that support subjecting their minors to these shows are fulfilling their own dreams and affecting minors in a very, very negative and profound way for life.").

Proponents also scoured the internet for anything to suggest that a conspiracy of drag queens is circling Montana's children and youth. They fell short. Senator Carl Glimm, who carried the bill in the Senate, obliquely referenced "sickening examples" found in "a simple Google search." Mont. Leg., S. Floor Sess., 18:09:01–18:10:14 (Apr. 17, 2023);[4] 1-ER-31. A proponent described a single event held on private property in Texas, where children were exposed to a vulgar sign. Mont. Leg., H. Judiciary Comm. Hrg. at 08:48:50–08:49:10 (Feb. 9, 2023); Appellants' Br. 40.

Opponents to HB 359 tried to ascertain the limits of the law's prohibitions. One opponent noted that it would "prohibit a woman from

---

[4] *Available at* http://sg001-harmony.sliq.net/00309/Harmony/en/PowerBrowser/PowerBrowserV2/20170221/-1/46256?agendaId=273842.

dressing up as a male clown." Mont. Leg., Free Conference Comm. Hrg. at 12:12:25–12:12:30 (Apr. 26, 2023);[5] 2-ER-281–82. Another described librarians' fears that the law would expose libraries to liability for employing a transgender individual. *Id.* at 12:14:25–12:14:35; 2-ER-282. Still others expressed concern that HB 359 apparently extended to Disney princesses, a collegiate performance of Twelfth Night, and students costumed as past presidents. *Id.* at 12:14:40–12:15:10, 12:15:50–12:16:30; 2-ER-282.

While supporters' messaging remained consistent, HB 359 mutated frequently during the legislative session—from (1) a ban on "exhibit[ing] a gender identity that is different from a performer's gender assigned at birth" in businesses, schools, and libraries[6] to (2) a ban on "male or female impersonators" in businesses and any public space where minors may be present[7] to (3) a ban that incorporated Montana's existing law on obscenity[8] to (4) a relatively anodyne (if

---

[5] *Available at* https://sg001-harmony.sliq.net/00309/Harmony/en/PowerBrowser/PowerBrowserV2/20230426/-1/49764#handoutFile_.

[6] *Available at* https://leg.mt.gov/bills/2023/HB0399//HB0359_1.pdf.

[7] *Available at* https://leg.mt.gov/bills/2023/HB0399//HB0359_2.pdf.

[8] *Available at* https://leg.mt.gov/bills/2023/HB0399//HB0359_3.pdf.

unnecessary) restriction on adult-oriented performances[9] to (5) the law now in effect.

Shortly before the legislative session closed, the Montana Senate passed an amendment designed to remedy the bill's unconstitutionality. 1-ER-31–32. Senator Chris Friedel, who introduced the amendment, explained, "I can tell you right now, if that bill goes as [it was written], even the most conservative judge will strike it down for unconstitutionality." Mont. Leg., S. Floor Sess. at 18:11:50–18:11:59 (Apr. 17, 2023); 1-ER-31.

The amendment removed references to drag and instead focused on "adult-oriented performances." HB 359, 2nd Reading Amend. (adopted Apr. 17, 2023);[10] 1-ER-32. Senator Glimm argued the amendment was "not friendly" because it "completely derails the intent of the legislation" by "allow[ing] all these [drag performances] under art, so it completely guts the bill." Mont. Leg., S. Floor Sess. at 18:12:18–18:12:50 (Apr. 17, 2023); 1-ER-32–33. Senator Brad Molnar agreed. Noting that the bill had been motivated by a drag queen story

---

[9] *Available at* https://leg.mt.gov/bills/2023/HB0399//HB0359_4.pdf.
[10] *Available at* https://leg.mt.gov/bills/2023/AmdHtmS/HB0359.003.002.PDF.

7

hour at a privately owned zoo, he worried that the amendment would fail to prevent drag performances falling outside the constitutional definition of obscenity:

> I don't know that a story hour for children, though performed by people in full drag, would actually be covered by this bill if it were amended in this form. In the first place I'm not sure with a six-year-old if there is a prurient interest, and I'm positive that reading to children, even in drag, would not be considered an adult-oriented performance.

*Id.* at 18:13:18–18:14:10; 1-ER-33.

Ultimately, the cure did not hold. Mont. Leg., Free Conference Comm. Hrg. (Apr. 26, 2023).[11] The House rejected the Senate amendment, and a free conference committee (comprising members of both chambers) passed the final version of the bill. *Id.*; 1-ER-33–34; *see* HB 359; 2-ER-208–13.

---

[11] *Available at* http://laws.leg.mt.gov/legprd/LAW0240W$CMTE.ActionQuery?P_SESS =20231&P_COM_NM=Free+Conference+Committee+on+HB+359&P_A CTN_DTM=04/26/2023&U_ACTN_DTM=04/26/2023&Z_ACTION2=Fin d.

**B. HB 359 imposes criminal and/or occupational penalties for, *inter alia*, dressing up in gendered costumes while engaging in learning activities with children, displaying prosthetic breasts, and simulating the removal of clothing.**

HB 359 includes two substantive categories of restrictions: (1) drag story hours, and (2) "sexually oriented performances." Parallel penalty provisions apply, with individuals and entities subject to criminal, civil, and occupational consequences.

### 1. Drag Story Hours

HB 359 defines a "drag story hour" as "an event hosted by a drag queen or drag king who reads children's books and engages in other learning activities with minor children present." HB 359, § 1(3); 2-ER-208. A "drag king" or "drag queen" is "a male or female performer who adopts a flamboyant or parodic ['male' or 'feminine'] persona with glamorous or exaggerated costumes and makeup." HB 359, § 1(1), (2); 2-ER-208. The bill does not define the terms "other learning activities," "flamboyant," "parodic," "glamorous," "exaggerated," "costumes," or "makeup." HB 359, § 1; 2-ER-208–09. HB 359 does not, by its terms, apply only to public schools and libraries but instead prohibits holding a "drag story hour" in "[a] school or library that receives any form of

9

funding from the state . . . during regular operating hours or at any school-sanctioned extracurricular activity." HB 359, § 3(2); 2-ER-210.

Those who violate the drag story hour ban face criminal, civil, and occupational penalties. HB 359, §§ 3, 4; 2-ER-210–11. A person or designated entity who "allow[s]" a "drag story hour" faces criminal penalties. HB 359, § 5(2) (codifying restrictions on "drag story hours" in Mont. Code Ann. title 20); 2-ER-211; Mont. Code Ann. § 20-1-207 (providing that violations of title 20 constitute misdemeanor criminal offenses). Upon conviction, "[a] library, a school, or library or school personnel, [or] a public employee" "shall be fined $5,000." HB 359, § 3(1), (2), (4); 2-ER-210. Further, teachers and other school personnel will see their certificates suspended (upon a first conviction) and permanently revoked (upon a second or subsequent conviction). HB 359, § 3(4); 2-ER-210. There is no carveout for parental consent. 1-ER-48.

Any person involved in a drag story hour is also subject to civil liability. HB 359, § 4(1); 2-ER-210. A minor who attends a drag story hour—even with the consent of the minor's guardian—may sue any "person who knowingly promotes, conducts, or participates as a

10

performer in the performance" up to ten years after the drag story hour.

HB 359, § 4(1), (3); 2-ER-210–11.  The plaintiff is guaranteed statutory

damages; attorney's fees; and "actual damages, including damages for

psychological, emotional, economic, and physical harm."  HB 359, § 4(2);

2-ER-210–11.

### 2. Sexually Oriented Performances

Separately, HB 359 prohibits and restricts "sexually oriented

performances."  As defined, a "sexually oriented performance" is

> a performance that, regardless of whether performed for
> consideration, is intended to appeal to the prurient interest
> and features:
>
> (a) the purposeful exposure, whether complete or partial, of:
>
> > (i)  a human genital, the pubic region, the human
> > buttocks, or a female breast, if the breast is exposed
> > below a point immediately above the top of the areola;
> > or
> >
> > (ii)  prosthetic genitalia, breasts, or buttocks;
>
> (b) stripping; or
>
> (c) sexual conduct.

HB 359, § 1(10); 2-ER-209.

The definition of "sexually oriented performance" is not limited to

live events.  HB 359, § 1; 2-ER-208–09.  Nor is "stripping" limited to

11

performances involving complete or partial nudity; it even includes "simulated removal" of clothing in a "sexual manner." HB 359, § 1(11); 2-ER-209 (emphasis added). HB 359 does not define "sexual manner." HB 359, § 1; 2-ER-208–09. "Sexual conduct" is not defined within the definition of "sexually oriented performances." HB 359, § 1(10); 2-ER-209. A separate subsection of the bill defines "sexual conduct," but that subsection—which also defines "sexually oriented"—is not incorporated into (or even consistent with) the definition of "sexually oriented performance." HB 359 § 1(8), (10); 2-ER-209. The separate definition of "sexually oriented" also includes "any simulation of sexual activity, stripping, salacious dancing, any lewd or lascivious depiction or description of human genitals or of sexual conduct as defined in [Montana Code Annotated §] 45-5-625." HB 359 § 1(8); 2-ER-209.

Even when no minor is present, HB 359 prohibits outright "sexually oriented performances" in "[a] library that receives any form of funding from the state," "on public property in any location where the performance is in the presence of an individual under the age of 18," and "in a location owned by an entity that receives any form of funding from the state." HB 359, § 3; 2-ER-210. Schools may not allow sexually

12

oriented performances "during regular operating hours or at any school-sanctioned extracurricular activity." HB 359, § 3(2); 2-ER-210.

HB 359 also restricts to adult-only audiences "sexually oriented performances" in "sexually oriented businesses." A "[s]exually oriented business" is defined as

> a nightclub, bar, restaurant, or similar commercial enterprise that:
>
> (a) provides for an audience of two or more individuals:
>
>> (i) live nude entertainment or live nude performances; or
>>
>> (ii) a sexually oriented performance; and
>
> authorizes on-premises consumption of alcoholic beverages.

HB 359, § 1(9); 2-ER-209.

Violators of the provisions governing "sexually oriented performances" face various criminal and administrative penalties. Business owners, operators, managers, and employees of "sexually oriented businesses" must pay mandatory criminal fines starting at $1,000, and businesses may lose their licenses. HB 359, §§ 2–4; 2-ER-209–11. Upon conviction, "[a] library, a school, or library or school personnel, a public employee, [a state-funded entity], or an employee of

13

the entity" "shall be fined" a criminal penalty of $5,000. HB 359, § 3(4); 2-ER-210.

Civil liability looms for anyone who "knowingly promotes, conducts, or participates as a performer" in a "sexually oriented performance." HB 359, § 4(1); 2-ER-210. Any minor who attends a "sexually oriented performance"—even with a guardian's consent—may sue within ten years. HB 359, § 4(3); 2-ER-211. Plaintiffs who prevail under HB 359 are entitled to $5,000 in statutory damages; attorney's fees; and "actual damages, including damages for psychological, emotional, economic, and physical harm." HB 359, § 4(2); 2-ER-210–11.

## C. HB 359 has led to cancelled events, self-censorship, and confusion.

HB 359 went into effect upon the governor's signature on May 22, 2023. HB 359, § 7; 2-ER-211. In the brief time the law was in effect and enforceable, it had wide-ranging impacts.

Plaintiff Adria Jawort, a Two Spirit and transgender woman (and not a drag king or queen under any ordinary definition), was disinvited from a scheduled appearance at the Butte Silver-Bow Public Library. A library employee wrote that Jawort's event was canceled because "it is too much of a risk to have a trans-person in the library." 2-ER-203; 1-

14

ER-4; 2-ER-199. The City and County of Butte-Silver Bow later confirmed via Facebook post that HB 359 forced the cancellation: "[i]n accordance with Governor Gianforte signing HB359 into law, our county cannot allow an event where a drag king or queen reads children's books and engages in other learning activities with minor children present. Due to this law, we have had to cancel the speaker at the Butte-Silver Bow Library." 1-ER-4–5; 2-ER-206.

Other Plaintiffs have seen events canceled or modified. 1-ER-51; 2-ER-193–95; 2-ER-187. The Imperial Sovereign Court of the State of Montana ("Imperial Court")—a drag-focused nonprofit organization—modified its speech and expression to limit its risk of liability under the law. 1-ER-51; 2-ER-189–96. Because of HB 359, the Imperial Court restricted all-ages drag shows and chose not to advertise its drag performances. 2-ER-189–96. For example, at Billings Pride, held from June 22 to 24, 2023, the Imperial Court did not perform drag shows on public property out of fear of HB 359. 2-ER-194. Other performance groups and LGBTQ+ advocacy organizations—including Plaintiffs Western Montana Community Center and Great Falls LGBTQ+ Center (collectively, the "Centers"), BumbleBee Aerial Fitness, and Montana

15

Pride—have also modified activities or faced pressure to do so. 1-ER-51; 2-ER-187; 2-ER-295–98.

Plaintiff businesses—Imagine Nation Brewing Company, Montana Book Company, The Roxy Theater, and The Myrna Loy— either are "sexually oriented businesses" as defined by HB 359 or are unable to determine whether they are because of the law's confusing language. 2-ER-175; 2-ER-169; 2-ER-164; 2-ER-298–99, 303–04. For example, Plaintiffs The Roxy Theater and The Myrna Loy show films that fall within the definition of "sexually oriented performances." 2-ER-175–78; 2-ER-169–70.

Plaintiffs sought emergency relief because the City of Helena refused to issue permits for Montana Pride events. 2-ER-137. Despite stating that it intended to issue the permits, the city only did so after a temporary restraining order was in effect. 2-ER-58-59; 2-ER-106–25; SER-108–09, 112. Further, the city informed the district court that it feared issuing the permits would subject its own employees to criminal and civil liability under HB 359. 1-ER-4; 2-ER-127; SER-109-13.

Individuals and entities, including Plaintiffs, cannot determine whether and to what extent they must stifle their speech to avoid severe

state-sanctioned penalties. Plaintiff Rachel Corcoran, a public school teacher, faces decertification as well as criminal and civil liability for wearing costumes to engage her students in school. 2-ER-131–32. Plaintiffs The Roxy Theater and The Myrna Loy appear to be prohibited from showing films to audiences consistent with industry standard Motion Picture Association ratings. 2-ER-175–81; 2-ER-169–70. And businesses, including Plaintiffs Montana Book Company and Imagine Nation Brewing Company, face criminal and civil penalties and delicensure simply for holding events featuring drag or nonobscene sexual content. 2-ER-163–64; 2-ER-298–99.

### D. Plaintiffs filed suit and successfully moved for a temporary restraining order and preliminary injunction.

Plaintiffs filed their complaint on July 7, 2023. 3-ER-314–52. When Plaintiff Montana Pride was unsure whether it would be able to host Helena's annual pride celebration, Plaintiffs moved for injunctive relief, seeking both a temporary restraining order and a preliminary injunction. 1-ER-9; 2-ER-214–60. On July 28, after a hearing at which Defendants Austin Knudsen and Elsie Arntzen (collectively, "the State") appeared, SER-48–125, the Court granted Plaintiffs' motion for a temporary restraining order, 2-ER-106–25.

17

The Court held a hearing on the preliminary injunction motion on August 28, 2023. 1-ER-3; 2-ER-60; SER-3–46. The Court granted the motion and issued its preliminary injunction order, the subject of the State's appeal, on October 13, 2023. 1-ER-2–54. Plaintiffs later filed for summary judgment. District court proceedings are stayed pending resolution of this appeal. *See* 3-ER-356–69.

### SUMMARY OF THE ARGUMENT

"Government has no power to restrict expression because of its message, its ideas, its subject matter, or its content." *Police Dep't of Chicago v. Mosley*, 408 U.S. 92, 95 (1972). Because HB 359 "singles out specific subject matter for differential treatment"—both drag and non-obscene sexual content—it is "presumptively unconstitutional." *Reed v. Town of Gilbert*, 576 U.S. 155, 163, 169 (2015). The State cannot rebut the presumption. Indeed, it largely tries to evade review under the First Amendment entirely, arguing in turn that Plaintiffs lack standing, that ordinary tiered scrutiny review does not apply, that the law does not regulate speech, and that the regulated expression is not protected. But the case is justiciable, and the law is patently unconstitutional.

18

As a threshold matter, Plaintiffs have standing. Self-censorship is injury, and Plaintiffs need not await prosecution to cure it. Plaintiffs' injuries are traceable to and redressable by Defendants Knudsen and Arntzen, both of whom have statutory authority to enforce HB 359.

Turning to the merits, the district court did not abuse its discretion in preliminarily enjoining the law's enforcement. Plaintiffs satisfy all four *Winter* factors. As the district court concluded, they are likely to succeed on the merits of their claims; the injunction prevents irreparable injury; and the balance of the equities and the public interest weigh in Plaintiffs' favor.

HB 359 is a content- and viewpoint-based law motivated by unmistakable legislative animus, triggering strict scrutiny review under the First Amendment. It fails. The State has no legitimate—let alone compelling—interest in restricting speech because it disapproves of its message and its speaker. The State's interest in protecting children is not a free pass to exclude perspectives from the marketplace of ideas. Moreover, even if the State identified a compelling interest, the law is wildly overbroad and underinclusive. Plaintiffs likely will prevail under the First Amendment.

19

And yet, as discriminatory as HB 359 is, the law fails to target any speech with the specificity the Fifth Amendment requires. Key terms go undefined; overlapping provisions do not reference each other; and it is unclear where the restrictions on speech apply. HB 359 does not give fair notice of what it criminalizes; it can only lead to discriminatory enforcement. The law is void for vagueness. Plaintiffs are likely to succeed on the merits of their Fifth Amendment claim.

The remaining *Winter* factors only strengthen Plaintiffs' entitlement to a preliminary injunction. Self-censorship—indeed, actual censorship—occurred while HB 359 was briefly in effect, demonstrating that irreparable harm is not only likely but certain to occur absent injunctive relief. Moreover, the State has no legitimate interest in violating fundamental constitutional rights, while Plaintiffs and the public benefit from the robust exchange of ideas to which they are constitutionally entitled.

Finally, the district court did not err when it enjoined the State from enforcing HB 359 throughout the District of Montana. And there is no reason to decide this issue—the State waived it by failing to raise it before the district court. Even if it had been preserved, however, the

20

State's argument would fail. The law is a facially unconstitutional restriction on speech, and it cannot be enforced.

## STANDARD OF REVIEW

This Court's review of a preliminary injunction order is "limited." *Does 1–5 v. Chandler*, 83 F.3d 1150, 1152 (9th Cir. 1996). "The grant or denial of a preliminary injunction will be reversed only where the district court abused its discretion or based its decision on an erroneous legal standard or on clearly erroneous findings of fact." *Id.* "Whether factual findings satisfy a First Amendment legal standard . . . is reviewed de novo." *Junior Sports Magazines Inc. v. Bonta*, 80 F.4th 1109, 1115 (9th Cir. 2023). The scope of the injunction likewise is reviewed for abuse of discretion. *Cal. Chamber of Commerce v. Council for Educ. & Research on Toxics*, 29 F.4th 468, 475 (9th Cir. 2022).

## ARGUMENT

The district court properly enjoined the State from enforcing HB 359. First, Plaintiffs have standing. 1-ER-12–21. Second, the district court appropriately considered and weighed the *Winter* factors, concluding that Plaintiffs likely will succeed on the merits under both the First and Fifth Amendments, 1-ER-21–50, that an injunction is

21

necessary to prevent irreparable harm from occurring, 1-ER-50–51, and that an injunction serves the equities and the public interest, 1-ER-51–52. Third, the district court did not abuse its discretion in enjoining the State's enforcement of HB 359 throughout the District of Montana.

## I. Plaintiffs have standing to challenge HB 359, which threatens them with criminal and occupational penalties enforceable by Defendants Knudsen and Arntzen.

The traditional rules of standing are relaxed for facial challenges under the First Amendment. *Broadrick v. Oklahoma*, 413 U.S. 601, 612 (1973); *see also Sec'y of State of Md. v. Joseph H. Munson Co.*, 467 U.S. 947, 956–57 (1984) (identifying a "lessening of prudential limitations on standing"); *Libertarian Party of L.A. Cty. v. Bowen*, 709 F.3d 867, 870 (9th Cir. 2013) ("the inquiry tilts dramatically toward a finding of standing").

Three elements are necessary to show standing: injury, causality, and redressability. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992). All are met. Plaintiffs must self-censor or risk criminal liability, establishing injury-in-fact. 1-ER-50–51; *see, e.g.*, 2-ER-131–32; 2-ER-163–64; 2-ER-169–71; 2-ER-180–81; 2-ER-186–87; 2-ER-193–95; 2-ER-199–200; *infra* § 1.A. Defendants Knudsen and Arntzen cause this

22

unconstitutional dilemma because they have legal authority to enforce HB 359. *See* 1-ER-13–17; *infra* § I.B. And Plaintiffs' injuries are redressable through injunctive relief, which prevents Defendant Knudsen from forcing criminal proceedings and Defendant Arntzen from initiating occupational disciplinary proceedings. *See infra* § I.C. Plaintiffs have standing. 1-ER-17–21.

### A. Plaintiffs suffer injury-in-fact because they must self-censor or risk criminal and occupational liability.

Plaintiffs must censor their speech or risk prosecution by Defendant Knudsen and occupational discipline by Defendant Arntzen. Plaintiffs establish injury in fact—"'an invasion of a legally protected interest' that is 'concrete and particularized' and 'actual or imminent, not conjectural or hypothetical.'" *Spokeo, Inc. v. Robins*, 578 U.S. 330, 339 (2016) (quoting *Lujan*, 504 U.S. at 560).

Plaintiffs "allege that [their] speech is being chilled by a statute of general and prospective applicability that may be enforced against it." *Twitter, Inc. v. Paxton*, 56 F.4th 1170, 1175 (9th Cir. 2022). "[I]n [this] context . . . [,] 'it is sufficient for standing purposes that the plaintiff intends to engage in a course of conduct arguably affected with a constitutional interest and that there is a credible threat that the

23

challenged provision will be invoked against the plaintiff.'" *ACLU of Nev. v. Heller*, 378 F.3d 979, 983 (9th Cir. 2004) (quoting *Ariz. Right to Life Political Action Comm. v. Bayless*, 320 F.3d 1002, 1006 (9th Cir. 2003)).

First, there is no legitimate question whether Plaintiffs intend "to engage in a course of conduct arguably affected with a constitutional interest." *ACLU of Nev.*, 378 F.3d at 983. Plaintiffs have either self-censored their speech or are likely violating HB 359. 1-ER-51; *see, e.g.*, 2-ER-131–32; 2-ER-163–64; 2-ER-169–71; 2-ER-180–81; 2-ER-186–87; 2-ER-193–95; 2-ER-199–200.

Second, the threat of enforcement is credible. *ACLU of Nev.*, 378 F.3d at 983. Defendants argue that they personally did not undertake specific enforcement actions against Plaintiffs in the short period between the law's effective date and the temporary restraining order. Appellants' Br. 14 ("Plaintiffs in this case have made no allegation of any actual enforcement action taken by the State Defendants."). This is not the test. *See Valle del Sol Inc. v. Whiting*, 732 F.3d 1006, 1015 (9th Cir. 2013) (plaintiff "need not await prosecution to challenge" law

imposing criminal penalties implicating First and Fifth Amendment interests).

Plaintiffs need not be subject to an ongoing criminal prosecution; "nor need they actually commit the forbidden provisions as a means of showing them to be in the dilemma . . . [of] 'the hapless plaintiff[s] between the Scylla of intentionally flouting . . . [the] law and the Charybdis of forgoing what [they] believe[] to be constitutionally protected activity in order to avoid becoming enmeshed in a criminal proceeding.'" *Am.-Arab Anti-Discrimination Comm. v. Thornburgh*, 970 F.2d 501, 508 (1991) (quoting *Steffel v. Thompson*, 415 U.S. 452, 462 (1974)); *see Lopez v. Candaele*, 630 F.3d 775, 785 (9th Cir. 2010) ("[P]laintiffs may establish an injury in fact without first suffering a direct injury from the challenged restriction.").

Rather, the injury-in-fact requirement "is met here, as the law is aimed directly at plaintiffs, who, if their interpretation of the statute is correct, will have to take significant and costly compliance measures or risk criminal prosecution." *Virginia v. Am. Booksellers Ass'n*, 484 U.S. 383, 392 (1988). Plaintiffs need clarity to fully exercise their free speech rights. For example, Plaintiff Imperial Court has reduced and

changed advertising for drag events, modified performances, and restricted audiences. 2-ER-193–95; *see Fellowship of Christian Athletes v. San Jose Unified Sch. Dist. Bd. of Educ.*, 82 F.4th 664, 683 (9th Cir. 2023) ("Lost money and 'staff time spent responding' to a challenged government action are directly redressable and, under our precedent, vest direct organizational standing.").

"The State has not suggested that the newly enacted law will not be enforced, and [there is] no reason to assume otherwise." *Am. Booksellers Ass'n*, 484 U.S at 393; *see Epperson v. Arkansas*, 393 U.S. 97, 100–03 (1968) (because anti-evolution curriculum law threatened schoolteacher with criminal penalties, challenge was justiciable despite the possibility "that the statute is presently more of a curiosity than a vital fact of life"). HB 359 targets Plaintiffs and their speech, and the State does not even attempt to argue it will forgo enforcement. *See Project Veritas v. Schmidt*, 72 F.4th 1043, 1053 (9th Cir. 2023) (standing satisfied for claims against county attorney and attorney general when there was some history of enforcement within the state of Oregon and Oregon "does not state that it would refrain from prosecuting").

As the district court concluded, Plaintiffs experience broad, overlapping injuries in the form of self-censorship, changed practices, and the risk of criminal prosecution. 1-ER-51. Indeed, the only apparent reason that the State would not enforce HB 359 against Plaintiffs is that it would apply it discriminately, based only on the viewpoint or identity of the speaker—reinforcing the merits of Plaintiffs' vagueness challenge. *See infra* § II.A.2. HB 359 injures Plaintiffs.

## B. Plaintiffs' injuries are traceable to Defendants, who have enforcement authority under Montana law.

Defendants play critical roles in enforcing HB 359 and are properly named. Defendant Knudsen may force both prosecution and dismissal of prosecution under HB 359. Defendant Arntzen may initiate disciplinary proceedings against teachers, including Plaintiff Rachel Corcoran.

### 1. Attorney General Knudsen may compel county attorneys to enforce HB 359, causing Plaintiffs' injuries.

An attorney general who can "direct, in a binding fashion, the prosecutorial activities of the officers who actually enforce the law or bring his own prosecution" is properly named as a defendant under both

*Lujan* and *Ex Parte Young*. *Planned Parenthood of Idaho, Inc. v. Wasden*, 376 F.3d 908, 919 (9th Cir. 2004). Attorney General Knudsen may "compel [county] attorneys to prosecute or refrain from doing so." *S. Pac. Transp. Co. v. Brown*, 651 F.2d 613, 615 (9th Cir. 1980); *see* Mont. Code Ann. § 2-15-501(5). He is properly named.

As "the legal officer of the state" tasked with enforcing Montana's criminal code, Mont. Const. art VI, § 4(4), Attorney General Knudsen may "order or direct" county attorneys to "promptly institute and diligently prosecute" any perceived violation of HB 359, Mont. Code Ann. § 2-15-501(5). Although he cannot "file criminal proceedings in his own name," this is a limitation in form, not substance; it is "no limitation on the supervisory powers and control of the attorney general over the county attorneys of [Montana] as provided by law." *State ex rel. Woodahl v. Dist. Court of First Jud. Dist.*, 495 P.2d 182, 185 (Mont. 1972) (although not able to directly file information, "the attorney general should immediately direct the county attorney . . . to sign and file the necessary information and proceed with prosecution of the case").

The State argues "neither Plaintiffs nor the district court point to any instance where the Attorney General (past or present) has actually exercised that authority." Appellants' Br. 18. Because the statutory text is clear, there is no need to provide such examples. *See McGirt v. Oklahoma*, 140 S. Ct. 2452, 2469 (2020) ("There is no need to consult extratextual sources when the meaning of a statute's terms is clear. Nor may extratextual sources overcome those terms. The only role such materials can properly play is to help clear up[,] not create[,] ambiguity about a statute's original meaning.").

But the State does not say outright that the Attorney General has not used that authority, and they made no such claim to the district court. Nor could they: Defendant Knudsen has, in fact, directed local prosecutions. *See Montana v. Rodney Robert Smith*, No. CDC 2020-624 (Mont. 1st Dist. Ct., Lewis & Clark Cty.) (county prosecutor charged individual with felony assault with a weapon for allegedly brandishing a gun at and physically assaulting a server who asked him to wear a mask; county attorney refused to drop felony charge upon attorney general's demand; attorney general assumed prosecution and dismissed felony charge).

29

So, too, have prior Montana attorneys general. Rachel E. Barkow, *Federalism & Criminal Law: What the Feds Can Learn from the States*, 109 Mich. L. Rev. 519, 559 (2011) (though "infrequently," "the AG has used this authority [to force prosecutions] in Montana, particularly in capital cases and crimes against children"); Comment, Quinn Yeargain, *Discretion Versus Supersession: Calibrating the Power Balance Between Local Prosecutors & State Officials*, 68 Emory L.J. 95, 113–15 (2018) (describing Montana as one of only three states with particularly "subservient" local law enforcement authorities); Mont. Attorney Gen. Tim Fox, *2016 James R. Browning Symposium*, 78 Mont. L. Rev. 21, 22–23 (2017) ("Fortunately, in State law, there is a provision that provides that the attorney general is to have a supervisory authority over county attorneys. . . ."); *Montana ex rel. Fletcher v. Dist. Ct. of Nineteenth Judicial Dist.*, 859 P.2d 992, 998 (Mont. 1993) (attorney general properly ordered county attorney to dismiss charges).

Setting aside the absurdity that would entail if a plaintiff were required to name every potential enforcement officer to challenge a statewide speech regulation, the State's contention that Montana's "56 county attorneys remain free to prosecute under HB 359,

30

notwithstanding the district court's preliminary injunction" is untrue as a matter of Montana law. *See* Appellants' Br. 10. In fact, a county attorney must prosecute if the Attorney General commands her to, and she must stop if the Attorney General tells her so. Mont. Code Ann. § 2-15-501(5), (7); *see, e.g., Fletcher*, 859 F.2d at 998 ("Under § 2-15-501 . . . , the Attorney General was well within his authority to then conclude that there was insufficient, untainted evidence on which to continue prosecution . . . and to direct the Lincoln County Attorney to file motions to dismiss the charges.").

Plaintiffs' injuries are traceable to Defendant Knudsen. There is no legitimate question that Defendant Knudsen has legal authority to direct prosecution under HB 359.

### 2. Superintendent of Public Instruction Arntzen may initiate teacher disciplinary proceedings under HB 359; thus, she causes Plaintiffs' injuries.

Like Defendant Knudsen, Defendant Arntzen has legal authority to force the initiation of proceedings under HB 359. As the Montana Superintendent of Public Instruction, Arntzen is responsible for "issu[ing], renew[ing], or deny[ing] teacher certification and emergency authorizations of employment." Mont. Code Ann. § 20-3-106(2).

31

HB 359 requires suspension and/or revocation of a teacher's certificate if the teacher, or an invited guest, "reads children's books and engages in other learning activities with minor children present" while "adopt[ing] a flamboyant or parodic [male or female] persona with glamorous or exaggerated costumes and makeup."

Although the Board of Public Education ultimately oversees suspension and revocation of teaching certificates, it may initiate disciplinary proceedings only upon request of Defendant Arntzen or a local board of trustees. Mont. Code Ann. § 20-4-110(2). Defendant Arntzen possesses nearly unrestrained power to request that the Board initiate disciplinary proceedings, meaning that she may take action to enforce HB 359. Mont. Code Ann. § 20-4-110(2)(b).

The State argues that "Defendant Arntzen is not the only party empowered by Montana law to initiate proceedings against [Plaintiff Rachel] Corcoran's teaching license." Appellants' Br. 19. But a plaintiff suing one enforcement authority need not sue all potential enforcement authorities. If the State believes the participation of local boards of trustees (or all 56 county attorneys, for that matter) is necessary to resolve Plaintiffs' claims, it has a remedy. *See* Fed. R. Civ. P. 19, 20. It

32

does not, however, have a defense against Plaintiffs' claims on the basis that others also could have been named as defendants.

Defendant Arntzen has the legal authority to initiate disciplinary proceedings against Plaintiff Corcoran.  She was named properly.

**C.**   **Injunctive relief redresses the injury Defendants cause by barring them from using their enforcement authority.**

Because Plaintiffs' injuries are traceable to Defendants, Plaintiffs' injuries are redressed by the preliminary injunction against them.  *See Nat. Res. Def. Council v. EPA*, 542 F.3d 1235, 1245 (9th Cir. 2008) (noting close relationship between causation and redressability).  As with causation, the State misstates and misapplies the standard for redressability.  Injunctive relief cures Plaintiffs' injuries traceable to Defendants.  Nothing more is required.  The preliminary injunction prevents defendants, who otherwise may enforce the law, from doing so. This is particularly so because HB 359 authorizes Defendant Knudsen to force prosecution of government officials that allow prohibited events to occur—the same government officials he claims Plaintiffs must sue.

The positions of two local governments involved in the underlying proceeding are instructive.  The City of Helena, which was dismissed as a party after issuing permits for Pride, "request[ed]" that the district

court grant the injunction because HB 359 forces on local governments a "Hobson's choice": "the City itself is in the position of either choosing to infringe upon Plaintiff's constitutional rights to freely express themselves . . . or subject City employees to civil and criminal liability under the provisions of HB 359." 2-ER-127. Similarly, the Chief Executive of the City and County of Butte-Silver Bow—which revoked Plaintiff Adria Jawort's invitation to give a lecture on Two-Spirit and LGBTQ+ history—stated that Jawort's event was canceled because of "the ambiguous language of HB 359" and "possible criminal penalties and civil liability associated with violating HB 359." 2-ER-66; *see also* 2-ER-203 (letter from librarian stating that local officials "decided it is too much of a risk to have a trans-person in the library"; 2-ER-206 (Facebook post from local government explaining that event was canceled to comply with state law).

Finally, the State's position is as head scratching as it is legally inaccurate. If the State got its way, forcing Plaintiffs to sue 56 separate county attorneys and more than 300 local school boards, docket management would become more challenging, but the parties ultimately would end up in the same place. The Attorney General, "the

34

legal officer of the state," Mont. Const. art. VI, § 4, would receive notice of a constitutional challenge, Fed. R. Civ. P. 5.1, and ultimately would bear the responsibility to defend (or choose not to defend) HB 359's constitutionality, Mont. Code Ann. § 2-15-501(1). The law requires no such exercise in futility: Plaintiffs satisfy all requirements of standing.

II. **The district court did not abuse its discretion in preliminarily enjoining enforcement of HB 359 when HB 359 was intended to target drag and has the effect of broadly criminalizing speech.**

As the district court correctly concluded, all four *Winter* factors favor Plaintiffs. Plaintiffs are likely to succeed on the merits of their claims—on its face, HB 359 violates the First and Fifth Amendments. It is a content- and viewpoint-based regulation of speech, subject to strict scrutiny under the First Amendment. And the State's claimed interest in protecting children has no relationship to the law itself. HB 359 fares no better under the Fifth Amendment—it is impossible to understand, opening the door to (and, in fact, already causing) discriminatory enforcement and self-censorship.

Where, as here, "a party has established likelihood of success on the merits of a constitutional claim—particularly one involving a fundamental right—the remaining *Winter* factors favor enjoining the

35

likely unconstitutional law." *Junior Sports Magazines Inc. v. Bonta*, 80 F.4th 1109, 1120 (2023). The preliminary injunction order should be affirmed.

### A. Plaintiffs likely will succeed on the merits of their claims under the First Amendment.

HB 359's restrictions on speech fall firmly within the First Amendment. Doc. 33 at 21. Because HB 359 regulates speech on the basis of its content and viewpoint, it is "presumptively invalid." *R.A.V. v. City of St. Paul*, 505 U.S. 377, 382 (1992). The State cannot rebut the presumption. HB 359 advances no compelling government interest. Even if it did, it is not narrowly tailored to that interest. The district court did not err in concluding that the first *Winter* factor is satisfied as to Plaintiffs' First Amendment Claim.

#### 1. Tiered scrutiny applies to Plaintiffs' First Amendment challenge.

As a threshold matter, the State contends that the Court should apply overbreadth doctrine. Although Plaintiffs ultimately would succeed under any framework, *see infra* § II.A.3–5, the appropriate framework is tiered scrutiny, as correctly applied by the district court.

The State ignores the vast body of First Amendment law involving facial challenges, which generally trigger tiered scrutiny. *See, e.g.*, *Citizens United v. Fed. Election Comm'n*, 558 U.S. 310, 330, 340 (2010) (reviewing statute for facial constitutionality—even after dismissal of count raising facial challenge—and applying tiered scrutiny); *United States v. Playboy Ent. Grp., Inc.*, 529 U.S. 803 (2000) (strict scrutiny applied to facial challenge); *Project Veritas v. Schmidt*, 72 F.4th 1043 (9th Cir. 2023) (same); *IMDb.com v. Becerra*, 962 F.3d 1111 (9th Cir. 2020) (same); *Tschida v. Motl*, 924 F.3d 1297 (9th Cir. 2019) (same); *Coyote Pub., Inc. v. Miller*, 598 F.3d 592, 599 (9th Cir. 2010) (intermediate scrutiny applied to facial challenge to commercial speech restriction). "[W]hen seeking a preliminary injunction 'in the First Amendment context, the moving party bears the initial burden of making a colorable claim that its First Amendment rights have been infringed, or are threatened with infringement, at which point the burden shifts to the government to justify the restriction.'" *Sanders Cty. Republican Cent. Comm. v. Bullock*, 698 F.3d 741, 744 (9th Cir. 2012) (quoting *Thalheimer v. City of San Diego*, 645 F.3d 1109, 1116 (9th Cir. 2011)).

37

The "overbreadth doctrine" does not apply here because Plaintiffs assert their own free speech rights and because their speech falls squarely within the scope of the First Amendment. The overbreadth doctrine applies when "an individual whose own speech or conduct <u>may be prohibited</u> is permitted to challenge a statute on its face 'because it also threatens others not before the court—those who desire to engage in legally protected expression but who may refrain from doing so rather than risk prosecution or undertake to have the law declared partially invalid.'" *Bd. of Airport Comm'rs of L.A. v. Jews for Jesus, Inc.*, 482 U.S. 569, 574 (1987) (quoting *Brockett v. Spokane Arcades, Inc.*, 472 U.S. 491 (1985)) (emphasis added); *United States v. Hansen*, 599 U.S. 762, 770 (2023) ("the overbreadth doctrine allows a litigant (even an undeserving one) to vindicate the rights of the silenced, as well as society's broader interest in hearing them speak"); *see also Dombrowski v. Pfister*, 380 U.S. 479, 486 (1965) ("we have consistently allowed attacks on overly broad statutes with no requirement that the person making the attack demonstrate that his own conduct could not be regulated by a statute drawn with the requisite narrow specificity"). Overbreadth analysis applies only when the challenger's standing is

38

premised on the infringement of others' rights—but it also places an additional burden on the challenger to show that the "law's unconstitutional applications [are] realistic, not fanciful, and their number . . . substantially disproportionate to the statute's lawful sweep." *Hansen*, 599 U.S. at 770.[12]

By contrast, tiered scrutiny applies to facial and as-applied First Amendment challenges when a challenger's <u>own</u> speech rights are implicated—*i.e.,* when the challenger "mak[es] a colorable claim" of infringement. *Sanders Cty.*, 698 F.3d at 744. Thus, tiered scrutiny applies when standing is premised on direct infringement of speech (including self-censorship)—and when tiered scrutiny applies, the government carries a heavier burden.

Because Plaintiffs have made the requisite showing of direct standing to challenge HB 359, *see supra* § 1.A, the appropriate analysis is tiered scrutiny.

---

[12] The State's position that the overbreadth doctrine applies is logically inconsistent with its claims that Plaintiffs suffer no cognizable injury. *Broadrick*, 413 U.S. at 612 ("Litigants, therefore, are permitted to challenge a statute not because their own rights of free expression are violated, but because of a judicial prediction or assumption that the statute's very existence may cause others not before the court to refrain from constitutionally protected speech or expression.").en

### 2. HB 359 falls within the scope of the First Amendment because it regulates non-obscene speech.

HB 359 plainly regulates speech. There is no reasonable argument that costumes, such as those worn by HB 359's "drag kings" and "drag queens" are not protected by the First Amendment. *Schacht v. United States*, 390 U.S. 58, 62–63 (1970) (First Amendment protects performer's right to wear military costume to criticize the military); *see also Stromberg v. California*, 283 U.S. 359 (1931) (symbolic speech is speech). There is no reasonable argument that performances involving non-obscene sexual content are unprotected. *See also Playboy*, 529 U.S. at 812 (First Amendment encompasses sexually explicit materials "that many adults themselves would find . . . highly offensive" and that may "come[] unwanted into homes where children might see or hear it against parental wishes or consent"). And there is no reasonable argument that performances are not speech. *Berger v. City of Seattle*, 569 F.3d 1029, 1038 n.5 (9th Cir. 2009) ("performance art . . . has historically served an important role in the dissemination of ideas").

"'From 1791 to the present,' . . . the First Amendment has 'permitted restrictions upon the content of speech in a few limited areas,' and has never 'include[d] a freedom to disregard these

40

traditional limitations.'" *United States v. Stevens*, 559 U.S. 460, 468 (2010) (quoting *R.A.V.*, 505 U.S. at 382–83). These areas are few, and they include obscenity, incitement, and fighting words—"well-defined and narrowly limited classes of speech, the prevention and punishment of which have never been thought to raise any Constitutional problem." *Brown v. Ent. Merchants Ass'n*, 564 U.S. 786, 791 (2011) (quoting *Chaplinsky v. New Hampshire*, 315 U.S. 568, 571–72 (1942)).

HB 359 lands outside any established exception to the First Amendment—as the State ostensibly admits. Appellants' Br. 1 ("[The district court] assumed—without any meaningful analysis—that simply because the conduct at issue does not meet the established test for obscenity, that conduct automatically amounts to protected expression subject to strict scrutiny."). To be clear, HB 359 does not satisfy the constitutional standard for obscenity. Speech is obscene and falls outside the First Amendment's reach only when three requirements are met. HB 359 fails to incorporate even one. Constitutionally "obscene" speech: (1) "appeal[s] to the prurient interest in sex"; (2) "portray[s] sexual conduct in a patently offensive way"; and, (3) taken as a whole,

41

"lacks serious literary, artistic, political, or scientific value." *Miller v. California*, 413 U.S. 15, 24 (1973).

First, the only *Miller* requirement HB 359 mentions is the "prurient interest in sex," and only within the provision governing "sexually oriented performances"—not the drag story hour ban. HB 359, § 1(10); 2-ER-209. But the law fails to require that, "taken as a whole," the regulated conduct "appeals to the prurient interest," "applying contemporary community standards." *Miller*, 413 U.S. at 24 (quoting *Kois v. Wisconsin*, 408 U.S. 229, 230 (1972)). No jury could determine that HB 359's blanket proscription of drag and so-defined "sexually oriented performances" is consistent with "contemporary community standards."

Second, HB 359 does not merely regulate "patently offensive" speech. Even if the law mentioned this requirement (it does not), "patently offensive" speech translates to "hard core" pornography— "[p]atently offensive representations or descriptions of ultimate sexual acts, normal or perverted, actual or simulated," "masturbation," "excretory functions," and "lewd exhibition of the genitals." *Id.* at 25, 27. That definition does not and could not encompass "drag story

42

hours," removing outer layers of clothing "in a sexual manner," or the partial exposure of natural or prosthetic body parts.

Third, HB 359 ignores that drag has "serious literary, artistic, political, or scientific value," such that the First Amendment shields it from regulation. *Id.* at 24. Indeed, Representative Mitchell clarified that the law intentionally avoids carveouts for artistic speech: "The reason we have to specifically . . . say that we're prohibiting story hours is because all they do is call it art. That's how they get around it." Mont. Leg., Free Conference Comm. Hrg. at 12:29:10–12:29:17 (Apr. 26, 2023). What is more, HB 359 regulates artistic performances even outside of drag. For example, Plaintiffs The Roxy Theater and The Myrna Loy show films that fall within the definition of "sexually oriented performances." 2-ER-175–78; 2-ER-169–70. These films are not pornography, and they are not obscene, but HB 359 nevertheless prohibits them.[13]

---

[13] The State claims that another Montana statute limits the definition of performance in HB 359. *See* Appellants' Br. 25–26. It does not. Montana Code Annotated § 45-8-205(5) defines the term "performance" but the definitions in § 45-8-205 apply only "in [Sections] 45-8-205 through 45-8-208." HB 359 is not codified in those sections.

Nor does the *Miller* test go out the window whenever the State claims to be protecting children. Government may have somewhat more leeway in regulating obscene speech with respect to minors, *see Ginsberg v. New York*, 390 U.S. 629 (1968) (loosening pre-*Miller* test for obscenity set forth in *Roth v. United States*, 354 U.S. 476 (1957)), but "minors are entitled to a significant measure of First Amendment protection, and only in relatively narrow and well-defined circumstances may government bar public dissemination of protected materials to them," *Erznoznik v. Jacksonville,* 422 U.S. 205, 212–13, (1975). Thus, "it is clear . . . that under any test of obscenity as to minors not all nudity could be proscribed. Rather, to be obscene 'such expression must be, in some significant way, erotic.'" *Id.* at 214 n.10 (quoting *Cohen v. California*, 403 U.S. 15, 20 (1971)).

The drag story hour ban is not limited to "erotic" performances— there is nothing inherently sexual about exaggerated costumes or reading to children. Nor are the proscriptions on so-called "sexually oriented performances"—which include, *inter alia*, complete or partial nudity, the exposure of any part of "prosthetic, genitalia, breasts, or buttocks," and the "removal or simulated removal of clothing in a[n]

44

[undefined] sexual manner"—necessarily "erotic." HB 359, § 1(10), (11); 2-ER-209. Moreover, "sexually oriented performances" are criminally punishable whenever they occur "on public property in any location where the performance is in the presence of an individual under the age of 18" and—regardless whether minors are present—"in a location owned by an entity that receives any form of funding from the state." HB 359, § 3(3); 2-ER-210. It is therefore not even true that HB 359 exclusively targets speech directed to minors.

The State does not enjoy "a free-floating power to restrict the ideas to which children may be exposed." *Brown*, 564 U.S. at 794. Purported concerns about the effect on children may be relevant to the strength of a particular government interest, but they do not make protected speech unprotected. Rather, they "highlight[] the precise danger posed by" a regulation on speech—"that the <u>ideas</u> expressed by speech—whether it be violence, or gore, or racism—and not its objective effects, may be the real reason for the governmental proscription." *Id.* HB 359 implicates the First Amendment.

45

### 3. HB 359 discriminates on the basis of content and viewpoint, triggering strict scrutiny.

On its face, HB 359 is a content-based restriction on protected speech and expression. HB 359 also discriminates viewpoint, defining prohibited conduct based on the speaker's identity and the message conveyed. Further, HB 359 was adopted out of animus toward drag. The law is "presumptively unconstitutional" and subject to strict scrutiny. *See Reed*, 576 U.S. at 163.

"A regulation is content-based when it draws a distinction 'on its face' regarding the message the speaker conveys or 'when the purpose and justification for the law are content based.'" *Animal Legal Def. Fund v. Wasden*, 878 F.3d 1184, 1204 (9th Cir. 2018) (quoting *Reed*, 576 U.S. at 166). Viewpoint-based discrimination is "an egregious form of content discrimination," *Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 829 (1995)—"rais[ing] the specter that the Government may effectively drive certain ideas or viewpoints from the market place," *R.A.V.*, 505 U.S. at 387 (quoting *Simon & Schuster, Inc. v. Members of N.Y. State Crime Victims Bd.*, 502 U.S. 105, 116 (1991)). HB 359 is facially content- and viewpoint-based, triggering strict scrutiny review.

HB 359's regulation of "drag story hours" and "sexually oriented performances" "focus[] only on the content of the speech and the direct impact that speech has on [viewers]." *Playboy*, 529 U.S. at 811–12 (quoting *Boos v. Barry*, 485 U.S. 312, 321 (1988)). More than that, the line dividing the lawful from the unlawful in HB 359 depends on the identity and the viewpoint of the speaker. By targeting drag shows and drag performers—specifically because they did not want minors to see gender-nonconforming expression—the Montana legislature "attempt[s] to give one side of a debatable public question an advantage in expressing its views to the people," "plainly offend[ing]" the First Amendment. *See First Nat'l Bank of Boston v. Bellotti*, 435 U.S. 765, 785–86 (1978).

First, the drag story hour restrictions draw an unmistakable distinction between certain learning activities based exclusively on whether the performer wears a gendered costume. The restricted speech is defined in part by the <u>messenger's identity</u>—"the specific motivating ideology . . . or perspective of the speaker." *Reed*, 576 U.S. at 168. HB 359 allows reading children's books and engaging in other

47

learning activities with minor children present, as long as the performer is not dressed in a gendered costume.

Second, because HB 359 extends far beyond obscenity, it is no defense that the restrictions on "sexually oriented performances" were motivated by "concern for the effect of the subject matter on young viewers." *Playboy*, 529 U.S. at 811. Indeed, this is proof that the restriction is content-based. HB 359 singles out subsets of non-obscene performances and slaps them with a new, inaccurate label of "sexually oriented performances." *See Erznoznik*, 422 U.S. at 209–12 (restriction on showing films with nudity at a drive-in theater "discriminates against movies solely on the basis of content").

Further, even if HB 359 were not a <u>facially</u> content-based restriction on speech (it is), it nonetheless would be subject to strict scrutiny. The legislative history proves that "the purpose and justification for the law are content based." *Reed*, 576 U.S. at 167; *see also Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989) (content-neutral laws subject to strict scrutiny when they cannot be "justified without reference to the content of the regulated speech" or were adopted "because of disagreement with the message" conveyed). If "an

48

impermissible purpose or justification" underpins a restriction on speech, the law is likewise subject to strict scrutiny. *City of Austin v. Reagan Nat'l Advert. of Austin, LLC*, 596 U.S. 61, 76 (2022).

The bill's sponsor specifically emphasized that HB 359 would protect children from "the mature themes surrounding drag shows and the exposure to inappropriate activities." Mont. Leg., S. Judiciary Comm. Hrg. at 11:10:05–11:10:20 (Apr. 4, 2023). He claimed, without any evidence or explanation of the purported dangers, that drag performances may "create an inadequate understanding of gender roles and experiences" for children. *Id.* And legislators ultimately rejected a more neutral version of the bill precisely because it was insufficiently focused on drag. Mont. Leg., S. Floor Sess. at 18:12:18–18:12:50, 18:13:18–18:14:10 (Apr. 17, 2023); Mont. Leg., Free Conference Comm. Hrg. at 12:29:10–12:29:17 (Apr. 26, 2023); Mont. Leg., H. Floor Sess. at 14:22:00–14:22:16 (May 1, 2023). There can be no mistake: legislators took aim at drag performers and the LGBTQ+ community. Whether the Court looks to the text of the law or the history leading to its enactment, strict scrutiny applies.

#### 4. HB 359 fails strict scrutiny.

Because it discriminates based on content and viewpoint, HB 359 is subject to strict scrutiny. *Rosenberger,* 515 U.S. at 829; *Perry Educ. Ass'n v. Perry Loc. Educators' Ass'n*, 460 U.S. 37, 45 (1983). The State must show that the law is "narrowly tailored to serve compelling state interests." *Reed*, 576 U.S. at 163 (*quoting R.A.V.*, 505 U.S. at 395); *see also Ashcroft v. ACLU*, 542 U.S. 656, 665 (2004) ("When plaintiffs challenge a content-based speech restriction, the burden is on the Government to prove that the proposed alternatives will not be as effective as the challenged statute.").

HB 359 fails at both steps of the strict scrutiny analysis: it was not motivated by a "compelling state interest[]," and even if it were, the means are not narrowly tailored to the end. *Reed*, 576 U.S. at 163. There is no "'actual problem' in need of solving," and HB 359 is not "actually necessary to the solution." *Brown*, 564 U.S. at 799.

First, the State's interest in protecting children has no meaningful relationship to HB 359 because the law both interferes with minors' protected First Amendment rights and regulates speech between adults. HB 359 includes no carve-outs for parental consent, and it is not even

50

limited to minors. When an entity receives state funds in "any form," it may <u>never</u> display "sexually oriented performances," even to an age-restricted audience. HB 359 § 3(3)(b); 2-ER-210. HB 359 has no relationship to the State's general interest in protecting children. And the State's actual interest—silencing drag performers—is not compelling.

Second, HB 359 is not narrowly tailored. HB 359 criminalizes broad but vaguely defined non-obscene conduct, including artistic speech and speech between adults, sweeping in speech far beyond the law's intended target. *See Reno v. ACLU*, 521 U.S. 844, 870 (1997) ("Regardless of whether the [law] is so vague that it violates the Fifth Amendment, the many ambiguities concerning the scope of its coverage render [the law] problematic for purposes of the First Amendment.").

Indeed, existing Montana law restricts obscenity to the full measure allowed under the Constitution. "When a plausible, less restrictive alternative is offered to a content-based speech restriction, it is the Government's obligation to prove that the alternative will be ineffective to achieve its goals." *Playboy*, 529 U.S. at 816. The State already maintains an adequately tailored law to prohibit and

51

criminalize obscene material—Mont. Code Ann. § 45-8-201, which incorporates the *Miller* test. 413 U.S. at 23–24. *See supra* § II.A.4. Indeed, a prior version of the bill used the term "obscene" to define the proscribed conduct according to *Miller*, and the Legislature amended the bill to remove "obscene" as a modifier.

Because it oversteps the boundaries of obscenity, HB 359 is overbroad. It criminalizes showing movies appropriate for minors— even to adult-only audiences. HB 359, § 3(3); 2-ER-210; 2-ER-169–70; 2-ER-175–77, 180. It may prohibit the public performance of dances that could be described as "salacious," and the sale or public readings of books that include "lewd or lascivious depiction[s] or description[s] of human genitals or of sexual conduct."[14] HB 359, § 1(8); 2-ER-209. It prohibits any performances that involve "stripping"—defined as removing or <u>pretending to remove</u> clothing "in a sexual manner"—even if nudity does not result. "Sexual manner" is not defined. HB 359 thus encompasses many non-obscene theatrical and film performances

---

[14] It is unclear whether or not HB 359 actually criminalizes "salacious dancing" or "lewd or lascivious depiction[s] or description[s] of human genitals or of sexual conduct." This is a separate—and equally significant—constitutional problem, triggering review under the Fifth Amendment. *See infra* § II.B.

(regardless whether they include drag)—even a performance that includes the playful removal of a glove or scarf. HB 359 prohibits these performances in businesses that serve alcohol when minors are present, HB 359, §§ 1(9), 2; 2-ER-209–10; "on public property in any location where the performance is in the presence of an individual under the age of 18," HB 359, § 3(3)(a); 2-ER-210; and "in a location owned by an entity that receives any form of funding from the state," even when the audience is restricted to adults, HB 359, § 3(3)(b); 2-ER-210.

Similarly, the drag story hour ban encompasses far more than drag performances in any conventional understanding of the term "drag." The terms "drag king" and "drag queen" are defined as "a male or female performer who adopts a flamboyant or parodic [male or female] persona with glamorous or exaggerated costumes and makeup." HB 359, § 1(1), (2); 2-ER-208. Essentially any costume with a discernible gender fits the bill—some individuals become "drag kings" or "drag queens" whenever they get dressed for work. Drag performers need not even be costumed in a manner incongruent with their sex or gender.

53

Moreover, the law's criminal and civil penalties incorporate no carveout for parental consent. *See Brown*, 564 U.S. at 802–04 (striking ban on sale of violent video games to minors where industry ratings system "does much to ensure that minors cannot purchase seriously violent games on their own, and that parents who care about the matter can readily evaluate the games their children bring home").

Overbreadth is enough, but here it is not all. HB 359 also is underinclusive. *See Brown*, 564 U.S. at 802 ("Underinclusiveness raises serious doubts about whether the government is in fact pursuing the interest it invokes, rather than disfavoring a particular speaker or viewpoint."). "While surprising at first glance, the notion that a regulation of speech may be impermissibly underinclusive is firmly grounded in basic First Amendment principles." *City of Ladue v. Gilleo*, 512 U.S. 43, 51 (1994). Underinclusiveness highlights the problem of viewpoint regulation, "suggest[ing] an attempt to give one side of a debatable public question an advantage." *Bellotti*, 435 U.S. at 785–786.

HB 359 ignores the many sources of sexual expression that children are exposed to on a daily basis—through television, the internet, and other media. It restricts drag and only some quasi-sexual

54

expression in only some locations. HB 359 extends to speech far beyond expression that may actually cause harm to minors—even beyond what legislators intended to curtail. And yet it fails to include much of the content that motivated the law in the first instance. HB 359 is not narrowly tailored to a compelling state interest. It fails strict scrutiny.

### 5. Even under the State's proposed framework, HB 359 is unconstitutionally overbroad.

Tiered scrutiny, rather than overbreadth doctrine, applies: the "overbreadth doctrine" applies where, unlike here, the challenged law "is constitutional as to the party before it." *Hansen*, 599 U.S. at 785 (Thomas, J., concurring) (emphasis added). *See supra* § II.A.3. But even if Plaintiffs' challenge were subject to analysis under the overbreadth doctrine, they would succeed on the merits of their First Amendment claim.

Where a statute "imposes a direct restriction on protected First Amendment activity, and where the defect in the statute is that the means chosen to accomplish the State's objectives are too imprecise, so that in all its applications the statute creates an unnecessary risk of chilling free speech, the statute is properly subject to facial attack." *Joseph H. Munson Co.,* 467 U.S. at 967–68 (footnote omitted); *see*

55

*also Members of the City Council of L.A. v. Taxpayers for Vincent*, 466 U.S. 789, 800 n.19 (1984) ("[W]here the statute unquestionably attaches sanctions to protected conduct, the likelihood that the statute will deter that conduct is ordinarily sufficiently great to justify an overbreadth attack."). The bar may be higher than tiered scrutiny, but Plaintiffs clear it easily.

"To guard against" the danger of chilled speech, "the overbreadth doctrine allows a litigant (even an undeserving one) to vindicate the rights of the silenced, as well as society's broader interest in hearing them speak." *United States v. Hansen*, 599 U.S. 762, 770 (2023). "If the challenger demonstrates that the statute 'prohibits a substantial amount of protected speech' relative to its 'plainly legitimate sweep,' then society's interest in free expression outweighs its interest in the statute's lawful applications, and a court will hold the law facially invalid." *Id.* (quoting *United States v. Williams*, 553 U.S. 285, 292 (2008)).

Insofar as HB 359 has a "plainly legitimate sweep," it is redundant of existing proscriptions on obscenity. *Id.; see supra* § II.A.2, 4. Thus, HB 359 succeeds <u>only</u> in prohibiting protected speech. *Id.; see*

56

*supra* § II.A.2. And it sweeps in broad categories of speech beyond what legislators anticipated in their zeal to prevent drag queens from reading books to children. *See supra* § II.B.4.

### B. Because HB 359's restrictions are unintelligible—except to authorize discriminatory enforcement—Plaintiffs are likely to succeed on the merits of their Fifth Amendment claim.

HB 359 provides no articulable basis to gauge whether speech will trigger the law's criminal penalties. Its text raises more questions than answers: no one can know how to comply with it, and law enforcement officers and prosecutors cannot know how to enforce it fairly and constitutionally. As the district court correctly concluded, Plaintiffs are likely to succeed on their Fifth Amendment void-for-vagueness claim.

At best, the State argues that HB 359 is not unconstitutionally vague because the terms the district court identified as vague relate in some way to sexuality or drag. Even if the State were correct that a general relationship with sexuality made the law clear (and the State is not), these arguments only strengthen Plaintiffs' First Amendment claim. The State cannot criminalize non-obscene speech because it relates in some way to sexuality or to drag—essentially, the State's

defense is that the law discriminates on the basis of viewpoint. *See supra* § II.A.3.

"[F]acial vagueness challenges are appropriate if the statute clearly implicates free speech rights." *Cal. Teachers Ass'n v. State Bd. of Educ.*, 271 F.3d 1141, 1149 (9th Cir. 2001) ("heightened vagueness scrutiny" applies to restriction on instructional speech). "A law is unconstitutionally vague if it does not give 'a person of ordinary intelligence fair notice of what is prohibited' or if it is 'so standardless that it authorizes or encourages seriously discriminatory enforcement.'" *Tucson v. City of Seattle*, __F.4th__, No. 23-35449, 2024 WL 390105, at *7 (9th Cir. Feb. 2, 2024) (quoting *Williams*, 553 U.S. at 304). HB 359 fails twice over. It fails to give fair warning of conduct that will draw prosecution. And it lacks adequate standards to protect against discriminatory enforcement.

### 1. HB 359's drag story hour ban fails to give "fair notice" of what it encompasses and leads to discriminatory enforcement.

As it relates to the ban on drag story hours, HB 359 prohibits "an event hosted [at a school or library that receives any form of funding from the state] by" a "male or female performer who adopts a

58

flamboyant or parodic male [or female] persona with glamorous or exaggerated costumes and makeup" when the performer "reads children's books and engages in other learning activities with minor children present." HB 359, §§ 1(1)–(3), 3(2); 2-ER-208, 210. The definitions of "drag king" and "drag queen" do not require that the performer be a different gender than the character. HB 359, § 1(1)–(2); 2-ER-208. "Flamboyant," "parodic," "glamorous," and "exaggerated" are undefined. Thus, the law ostensibly applies not only to readings hosted by drag performers but also by, *inter alia*, costumed superheroes, Disney princesses, lumberjacks, teachers on school spirit days, and librarians celebrating Halloween.

The State argues that HB 359 obviously refers to drag queens and drag kings—the problem is really "the challenge in choosing the right words to describe 'drag.'" Appellants' Br. 49. Precisely. "[E]ntertainment in which performers caricature or challenge gender stereotypes" is everywhere; it cannot be banned. *Id.* (quoting *Drag*, Merriam-Webster.com, https://www.merriam-webster.com/dictionary/drag).

59

The State's attempt to bring clarity to the drag story hour ban highlights a fundamental reason the Fifth Amendment protects citizens from enforcement of vague laws: they "encourage[] seriously discriminatory enforcement." *FCC v. Fox Television Stations, Inc.*, 567 U.S. 239, 254 (2012) (quoting *Williams*, 553 U.S. at 304). The text of the statute might encompass Dolly Parton, but the State claims it would only enforce it against RuPaul.

And, if the definition of "drag story hour" were not enough, it is unclear what activity triggers the drag story hour ban. What are the "learning activities" that a person in gendered costume cannot engage in? Can they play sports, for example, or color with crayons? Even the location in which the ban operates is unclear. Must schools, like libraries, receive state funding to fall within HB 359's purview? What does it mean for a school, library, or entity to receive "any form of funding from the state"? Does this include, for example, state-administered federal funds? County-administered state funds? Must the funding stream be active?

The deficiencies in HB 359's drag story hour ban cannot be cured by reference to any number of dictionary definitions. "Plaintiffs are left

60

guessing as to what behavior would subject them to citation and arrest." *Desertrain v. City of L.A.*, 754 F.3d 1147, 1155 (9th Cir. 2014). And the State's only answer is to promise to enforce it discriminatorily, which is no solution at all. *Papachristou v. City of Jacksonville*, 405 U.S. 156, 170 (1972) ("Where, as here, there are no standards governing the exercise of the discretion granted by the ordinance, the scheme permits and encourages an arbitrary and discriminatory enforcement of the law. It furnishes a convenient tool for harsh and discriminatory enforcement by local prosecuting officials, against particular groups deemed to merit their displeasure.") (cleaned up).

### 2. HB 359's restrictions on "sexually oriented performances" fail to give "fair notice" of what they encompass and lead to discriminatory enforcement.

HB 359's restrictions on sexually oriented performances fare no better. Rather than attempt to explain simply what a "sexually oriented performance" is, the State shows only that the individual words found within HB 359 have dictionary meanings. This does not resolve whether the terms provide fair notice in context. *See City of Chicago v. Morales*, 527 U.S. 41, 56 (1999) (although a term "may have a common and accepted meaning," that meaning is not necessarily

61

understandable within a challenged provision). HB 359 is vague on its face because "no standard of conduct is specified at all. As a result, 'men of common intelligence must necessarily guess at its meaning.'" *See Coates v. City of Cincinnati,* 402 U.S. 611, 614 (1971) (quoting *Connally v. Gen. Constr. Co.,* 269 U.S. 385, 391 (1926)).

HB 359 is so confusing, in fact, that its text is inconsistent with the State's explanations of the law's purported plain meaning. Examples follow.

- The definition of "performance" found in an existing provision of the Montana Code does not apply to HB 359. Mont. Code Ann. § 45-8-205(6) (defining "performance" for purposes of specific statutes unaffected by HB 359); *see* Appellants' Br. 26, 51. HB 359 does not define "performance."

- The sub-definition of "nude" is used to <u>define</u> "live nude entertainment or live nude performances" and therefore is not limited by those terms. HB 359, § 1(4), (9)(a)(i); 2-ER-208–09; *see* Appellants' Br. 51. And it plays no role in limiting the definition of "sexually oriented performance," which provides a separate (and

62

more onerous) restriction on the exposure of natural or prosthetic body parts. HB 359, § 1(10)(a); 2-ER-209.

- "Stripping" is not limited to the <u>actual</u> "removal of clothing." HB 359, § 1(11); 2-ER-209; *see* Appellants' Br. 48.

- The relationship between "salacious dancing" and "sexually oriented" and "sexually oriented performance" is unclear, HB 359, § 1(8), (10); 2-ER-209, as is the relationship between the latter two terms and "stripping," "simulation of sexual activity," and "lewd or lascivious depiction or description of human genitals or of sexual conduct," HB 359, § 1(8), (10); 2-ER-209; *see* Appellants' Br. 47–48.

- "[S]exually oriented performance" does not incorporate the law's definition of nudity; although it references "sexual conduct," that phrase is undefined within this section of the law. HB 359, § 1(10); 2-ER-209; *see* Appellants' Br. 52–53.

In other words, even the State cannot pinpoint what is and what is not a "sexually oriented performance."

Moreover, as with the drag story hour ban, *see supra* § II.B.1, it is unclear <u>where</u> the restrictions on "sexually oriented performances"

63

begin and end. While "presence" has a dictionary definition, the definition does not resolve what it means to outlaw "sexually oriented performances on public property in any location where the performance is in the presence of an individual under the age of 18." HB 359, § 3(3)(a); 2-ER-210. This is particularly troubling given the failure to define "performance," the restriction on partial nudity, the ban on "simulated removal of clothing," the proscription on any partial exposure of prosthetic breasts, and the reference to "any simulation of sexual activity, . . . salacious dancing, and lewd or lascivious depiction or description of human genitals or of sexual conduct." Is HB 359 violated when a person wears a bathing suit during a parade, partially exposing their buttocks or breast, and minors are watching the parade? When a pro-choice protestor wears a pink hat and carries a sign depicting the female reproductive system—potentially "lewd or lascivious depiction[s] . . . of human genitals"—on public streets, where minors may pass by?

Nor is it clear when a business may be labeled a "sexually oriented business," potentially subjecting the business and its employees to criminal penalties for, *inter alia*, showing films with crude humor

64

and/or nudity, hosting a musician who suggestively removes her jacket, or allowing drag queens to expose partial prosthetic cleavage. Compounding this problem is the law's outright ban (and accompanying criminal penalties) relating to "sexually oriented performances" "in . . . location[s] owned by an entity that receives any form of funding from the state." HB 359, § 3(3)(b); 2-ER-210.

HB 359 is void for vagueness in violation of the Fifth Amendment.

## C. The remaining *Winter* factors favor Plaintiffs: in the absence of an injunction, they will suffer irreparable harm; and the balance of the equities and the public interest weigh in their favor.

"[W]hen a party has established likelihood of success on the merits of a constitutional claim—particularly one involving a fundamental right—the remaining *Winter* factors favor enjoining the likely unconstitutional law." *Junior Sports Magazines*, 80 F.4th at 1120.

Absent the injunction, Plaintiffs must continue to self-censor or face criminal prosecution, satisfying the requirement of irreparable harm. "The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 373 (1976); *Associated Press v. Otter*, 682 F.3d 821, 826 (9th Cir. 2012).

The equities and public interest both sharply favor Plaintiffs, as the State has no legitimate interest in violating core constitutional rights. When the government opposes the issuance of a preliminary injunction, the final two factors—the balance of the equities and the public interest—merge. *See Nken v. Holder*, 556 U.S. 418, 435 (2009). The State offers only that "HB 359 is a duly enacted state statute" and that it purports to be protecting children. Appellants' Br. 55–56. But the law is disconnected from the State's general interest in protecting minors, *see Brown*, 564 U.S. at 800, and "it is always in the public interest to prevent the violation of a party's constitutional rights." *Melendres v. Arpaio*, 695 F.3d 990, 1002 (9th Cir. 2012).

The district court did not abuse its discretion in preliminarily enjoining the State's enforcement of HB 359.

## III. The preliminary injunction appropriately extends throughout the District of Montana.

After arguing (wrongly) that HB 359's enforcement falls into others' hands, *supra* § I, the State turns an about-face, asking that it be allowed to enforce HB 359 against individuals other than the Plaintiffs. Appellants' Br. 56–58. If, of course, the State has no enforcement authority—or if, as it claims, "anyone who seeks to engage in the

66

conduct at issue is . . . [a] party in this matter," Appellants' Br. 57—then the scope of the injunction has no effect on the State.

The State's request for a narrowed injunction should be rejected for two reasons. First, it was not raised before the district court and therefore has been waived. Second, even if the State may make this argument for the first time on appeal, no authority supports its argument, and so it should be rejected on the merits.

The State claims that the district court abused its discretion in enjoining their enforcement of HB 359 throughout the District of Montana. But it did not raise this argument below, and the district court did not have an opportunity to consider its merits in the first instance. 2-ER-70–103. As this Court reasoned in *Armstrong v. Brown*, it is not enough to "ma[k]e some contentions that are arguably relevant to its current challenge to the scope of the injunction." 768 F.3d 975, 981 (9th Cir. 2014). Rather, to challenge "the statewide scope of [an] inunction," a state government must, at minimum, "make . . . the specific scope arguments that it raises on appeal" or "provide . . . detail that would have permitted the district court to evaluate its claim." *Id.* Here, the State only discussed the scope of an injunction in its

discussion of the standard of review, 2-ER-83–84, and did not meaningfully engage with the issue in its argument section, 2-ER-102. This is reason enough to affirm the injunction's scope. *See, e.g.*, *id.*; *see also Barrientos v. 1801–1825 Morton LLC*, 583 F.3d 1197, 1216 (9th Cir. 2009) ("We agree with [plaintiffs] that [defendant] waived the objection to the scope of relief by failing to raise it before the district court. Accordingly, we decline to address it.").

Even if it were not waived on appeal, the State's position is without merit. The district court concluded that Plaintiffs likely will prevail on their claims that HB 359 is a <u>facially</u> unconstitutional regulation of speech. *See Rodgers v. Bryant*, 942 F.3d 451, 459 (8th Cir. 2019) (affirming statewide preliminary injunction because "broad preliminary relief is often appropriate under current law where, as here, a plaintiff brings a facial challenge to a statute under the First Amendment"); *see also Ashcroft v. ACLU*, 542 U.S. 656, 666 (2004) (affirming preliminary injunction enjoining federal enforcement of statute when plaintiffs demonstrated likelihood of success on First Amendment claim); *Sanders Cty.*, 698 F.3d at 749 (where statute was facially unconstitutional under the First Amendment, "Montana must

68

be enjoined forthwith from enforcing it"). The State cites no authority analyzing the scope of a preliminary injunction where, as here, the district court concluded the statute likely violates the First Amendment on its face and in its entirety.

*United States v. National Treasury Employees Union*, cited by the State, is not to the contrary. 513 U.S. 454 (1995). Considering a challenge to a ban on government employees' receipt of honoraria, the Supreme Court narrowed a permanent injunction to "all Executive Branch employees below grade GS-16" when higher level employees may have received a salary increase offsetting the ban and when "the Government conceivably might advance a different justification for an honoraria ban limited to more senior officials, thus presenting a different constitutional question." *Id.* at 478.

Here, in sharp contrast, the State has identified no category of individuals or entities who should be treated differently than Plaintiffs. Moreover, if this Court agrees with Plaintiffs and the district court, HB 359 is unconstitutional and entirely unenforceable. The State is not entitled to a narrowed injunction.

69

## CONCLUSION

The district court's order awarding a preliminary injunction should be affirmed.

Date: February 9, 2024

Constance Van Kley
Rylee Sommers-Flanagan
UPPER SEVEN LAW

Niki Zupanic
ZUPANIC LAW PLLC


*/s/ Constance Van Kley*
Constance Van Kley

*Attorneys for*
*Plaintiffs-Appellees*

70

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

## Statement of Related Cases Pursuant to Circuit Rule 28-2.6

## Ninth Circuit Case No. 23-3581

I hereby certify that I am unaware of any related cases currently pending in this court.

Date: February 9, 2024

/s/ Constance Van Kley
Constance Van Kley

*Attorney for Plaintiffs-Appellees*

71

## UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

### Certificate of Compliance for Briefs

### Ninth Circuit Case No. 23-3581

I am the attorney or self-represented party.

**This brief contains 13,072 words,** excluding the items exempted by Fed. R. App. P. 32(f). The brief's type size and typeface comply with Fed. R. App. P. 32(a)(5) and (6).

I certify that this brief complies with the word limit of Cir. R. 32-1.

Date: February 9, 2024

/s/ Constance Van Kley
Constance Van Kley

*Attorney for Plaintiffs-Appellees*

72

73

# FIRST ADDENDUM

Pursuant to 28-2.7, please find enclosed the pertinent treaties, statutes, ordinances, regulations or rules relevant to the issues under review:

## Statutes and Rules

House Bill 359..................................................................................... 74

## Statutes and Rules

House Bill 359

AN ACT PROHIBITING MINORS FROM ATTENDING SEXUALLY ORIENTED SHOWS; PROHIBITING DRAG STORY HOUR IN SCHOOLS AND LIBRARIES THAT RECEIVE PUBLIC FUNDING; PROHIBITING MINORS FROM ATTENDING SEXUALLY ORIENTED OR OBSCENE PERFORMANCES ON PUBLIC PROPERTY; PROHIBITING SEXUALLY ORIENTED PERFORMANCES IN LIBRARIES OR SCHOOLS THAT RECEIVE STATE FUNDING; PROHIBITING SEXUALLY ORIENTED PERFORMANCES ON PUBLIC PROPERTY WHERE CHILDREN ARE PRESENT; PROVIDING DEFINITIONS; PROVIDING PENALTIES; ESTABLISHING A PRIVATE RIGHT OF ACTION; AND PROVIDING AN IMMEDIATE EFFECTIVE DATE.

BE IT ENACTED BY THE LEGISLATURE OF THE STATE OF MONTANA:

**Section 1.  Definitions.**  As used in [sections 1 and 2], the following definitions apply:

(1)    "Drag king" means a male or female performer who adopts a flamboyant or parodic male persona with glamorous or exaggerated costumes and makeup.

(2)    "Drag queen" means a male or female performer who adopts a flamboyant or parodic feminine persona with glamorous or exaggerated costumes and makeup.

(3)    "Drag story hour" means an event hosted by a drag queen or drag king who reads children's books and engages in other learning activities with minor children present.

(4)    "Nude" means:

(a)  entirely unclothed; or

74

(b) clothed in a manner that leaves uncovered or visible through less than fully opaque clothing any portion of the breast below the top of the areola of the breasts if the person is female or any portion of the genitals or buttocks.

(5)   "Prurient interest in sex" has the same meaning as provided in 45-8-205.

(6)   "Public property" means any real property owned or leased, in whole or part, by the state or a political subdivision, as defined in 2-9-101, or held in the name of a political subdivision by a department, board, or authority of the state or a political subdivision.

(7)   "Obscene" has the same meaning as provided in 45-8-201.

(8)   "Sexually oriented" means any simulation of sexual activity, stripping, salacious dancing, any lewd or lascivious depiction or description of human genitals or of sexual conduct as defined in 45-5-625.

(9)   "Sexually oriented business" means a nightclub, bar, restaurant, or similar commercial enterprise that:

> (a)  provides for an audience of two or more individuals:
>
>> (i) live nude entertainment or live nude performances; or
>>
>> (ii) a sexually oriented performance; and
>
> (b)  authorizes on-premises consumption of alcoholic-beverages.

(10)  "Sexually oriented performance" means a performance that, regardless of whether performed for consideration, is intended to appeal to a prurient interest in sex and features:

> (a) the purposeful exposure, whether complete or partial, of:

75

(i) a human genital, the pubic region, the human buttocks, or a female breast, if the breast is exposed below a point immediately above the top of the areola; or

(ii) prosthetic genitalia, breasts, or buttocks;

(b)  stripping; or

(c)  sexual conduct.

(11)    "Stripping" means removal or simulated removal of clothing in a sexual manner for the entertainment of one or more individuals.

**Section 2.   Restrictions on sexually oriented businesses -- penalty.**

(1)    A sexually oriented business may not allow a person under 18 years of age to enter the premises of the business during  a sexually oriented performance.

(2)    The owner, operator, manager, or employee of a sexually oriented business who is convicted of violating this section shall be fined not less than $1,000 or more than $5,000 for the first offense, not less than $2,500 or more than $5,000 for the second offense, and for third and subsequent offenses be fined $10,000 and, if applicable, the county or municipality shall revoke the business license held by the offender.

(3)    [Sections 1 through 4] are applicable and uniform throughout the state and any political subdivisions.

**Section 3.   Where sexually oriented performances are prohibited.**

(1)    A library that receives any form of funding from the state may not allow a sexually oriented performance as defined in [section 1] on its premises.

(2)    A school or library that receives any form of funding from the state may not allow a sexually oriented performance or drag story

hour, as defined in [section 1], on its premises during regular operating hours or at any school-sanctioned extracurricular activity.

(3)    A sexually oriented performance is prohibited:

(a)  on public property in any location where the performance is in the presence of an individual under the age of 18; and

(b)  in a location owned by an entity that receives any form of funding from the state.

(4)    A library, a school, or library or school personnel, a public employee, or an entity described in subsection (3)(b) or an employee of the entity convicted of violating the prohibition under this section shall be fined $5,000 and, if applicable, proceedings must be initiated to suspend the teacher, administrator, or specialist certificate of the offender under 20-4-110 for 1 year. If an offender's certificate has previously been suspended pursuant to this subsection (4), proceedings must be initiated to permanently revoke the teacher, administrator, or specialist certificate of the offender under 20-4-110 on a subsequent violation of this section.

## Section 4.   Private right of action.

(1)    A minor who attends a performance in violation of [section 2] or [section 3] may bring an action against a person who knowingly promotes, conducts, or participates as a performer in the performance. The minor's parent or legal guardian may bring an action in the name of the minor for an action commenced under this section.

(2)    If a person prevails in an action brought under this section, the court shall award:

(a)  actual damages, including damages for psychological, emotional, economic, and physical harm;

(b)  reasonable attorney fees and costs incurred in bringing the action; and

(c) statutory damages of $5,000.

(3)    A person may bring an action under this section not later than 10 years from the date the cause of action accrues.

## Section 5.    Codification instruction.

(1)    [Sections 1 and 2] are intended to be codified as an integral part of Title 45, chapter 8, and the provisions of Title 45, chapter 8, apply to [sections 1 and 2].

(2)    [Section 3] is intended to be codified as an integral part of Title 20, chapter 7, part 1, and the provisions of Title 20, chapter 7, part 1, apply to [section 3].

(3)    [Section 4] is intended to be codified as an integral part of Title 27, chapter 1, and the provisions of Title 27, chapter 1, apply to [section 4].

**Section 6.   Severability**. If a part of [this act] is invalid, all valid parts that are severable from the invalid part remain in effect.  If a part of [this act] is invalid in one or more of its applications, the part remains in effect in all valid applications that are severable from the invalid applications.

**Section 7.   Effective date.** [This act] is effective on passage and approval.